Cratsley, J.
This case arises from a dispute over ownership rights to a sixty-six-foot 2001 Chapparral boat (“the boat”). The controversy is governed by Article 9 of the Uniform Commercial Code as adopted by the Commonwealth of Massachusetts (“Article 9”). The following is a procedural history of the two lawsuits consolidated for trial.
BACKGROUND
With respect to Suffolk No. 04-0295, on January 23, 2004, John Meskell (“Meskell”) commenced this lawsuit by filing a complaint against John and Linda Bertone (“the Bertones”) for return of a boat that the Bertones purchased from Meskell’s agent, Dale Friedman (“Friedman”) of Sea Dog Yacht Sales (“Sea Dog”). Based on allegations that the Bertones converted the boat from him, Meskell seeks a permanent injunction barring the Bertones from further depriving him of possession of the boat.
In their answer, the Bertones request dismissal of Meskell’s claim, as well as an award of reasonable attorneys fees and costs for insubstantial, frivolous, or bad faith claims pursuant to G.L.c. 231, §6F. In addition, the Bertones present a two-fold counterclaim. In Count I, the Bertones allege that Meskell breached the contract governing the boat sale. Accordingly, the Bertones seek specific performance of the contract, requiring Meskell to satisfy outstanding liens on the boat and to furnish the Bertones with clear title. In Count II, the Bertones charge Meskell with malicious prosecution and seek damages, attorneys fees, and costs.[3]
With respect to Suffolk No. 04-1481, on June 21, 2004, Key Bank (“the Bank”) filed an amended complaint naming Meskell and the Bertones as defendants. In Count I, the Bank sets forth a breach of contract claim against Meskell. On September 28, 2001, Meskell granted a security interest in the boat to the Bank to secure purchase money funds the Bank furnished to him. The Bank alleges that Meskell’s purported sale of the boat to the Bertones breached the security agreement. Consequently, the Bank seeks payment of the full amount due on the underlying promissoiy note. In Count II, the Bank asserts a claim for equitable relief against the Bertones. The Bank alleges that, it is the rightful owner of the boat, and seeks to enjoin the Bertones from preventing the boat’s repossession. In addition, the Bank requests a judgment awardinig it interest, attorneys fees, and costs.
The Bertones counterclaim against Bank, arguing that the Bank’s alleged attempts to repossess the boat violated the Federal Fair Debt Collection Practices Act, 15 U.S.C. §1692(f); the Massachusetts Collection Practices Act, G.L. 93, §49; and the Massachusetts Consumer Protection Act, G.L.c. 93A. The Bertones thus seek compensatory and punitive damages, attorneys fees, costs, and treble damages pursuant to G.L.c. 93A.
On April 29, 2004, both cases were consolidated for trial.
After trial without a jury and based upon all credible evidence, including thirty-one exhibits, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
On September 28, 2001, Meskell borrowed $31,601.75 from the Bank to finance his purchase of the boat. That day Meskell also executed a “Note, Security Agreement, and Disclosure Statement” in *424 connection with a loan he received from the Bank. Ex. 3. The security agreement lists the boat as collateral for the loan. Ex. 3. The note terms prohibit Meskell from transferring ownership or possession of the boat by sale, lease, or other means without first obtaining the Bank’s written permission. Ex. 3. In addition, the note terms define default as “breach [of] any significant term or condition of [the] Agreement.” Ex. 3. In the event of default, the note terms entitle the Bank to repossess the collateral and require Meskell to repay the entire loan balance. Ex. 3. The Bank did not file a financing statement documenting its security interest. The parties did not produce evidence of a financing statement at trial. Moreover, in September of2003, the Bertones commissioned the Doc-U-Search agency to search the Massachusetts Secretary of State filings for any financing statements then active against the boat. Ex. 12. The search revealed no active financing statements. Ex. 13. On October 5, 2001, the Massachusetts Division of Environmental Law Enforcement issued Meskell a Certificate of Title (“state title”) listing the Bank as first lien holder. Ex. 1. Meskell also obtained a state registration number for the boat. Ex. 2.
In late 2002, Meskell advertised the boat for sale in the Boston Globe. Kimberly Friedman contacted Meskell in response to the advertisement. Kimberly Friedman stated that her husband, Dale Friedman of Sea Dog, would be willing to procure a buyer for Meskell for a commission of ten percent of the purchase price. Meskell agreed to enlist Friedman as his sales agent and in February of2003 Meskell towed the boat to Sea Dog’s yard in Salisbury, Massachusetts. Friedman then placed a “For Sale” sign displaying Sea Dog’s logo on the boat and marked the asking price as $49,000.00. Ex. 26. Meskell and Friedman did not sign a written agency agreement.
In the spring of 2003, John Bertone was researching boats for sale. He discovered Sea Dog’s website and later met with Friedman to discuss purchasing a boat from Sea Dog. Friedman informed John Bertone that he was the owner of Sea Dog and represented all sellers. John Bertone later made a $44,000.00 offer on the boat to Friedman. Friedman told Bertone that the seller must approve the offer before Friedman could accept it. Friedman contacted Meskell, who accepted John Bertone’s offer. Friedman then informed John Bertone that the seller had accepted the offer.
Friedman prepared a Purchase and Sales Agreement (“initial P&S”). On June 28, 2003, John Bertone signed the initial P&S and tendered to Friedman a refundable deposit check payable to Sea Dog for $4,400.00. Ex. 4, 7B. Friedman then faxed the initial P&S to Meskell, who signed it on June 30, 2003. Ex. 4. Friedman and the Bertones conducted a sea trial on July 1, 2003, which revealed mechanical problems with the boat. While Meskell did assign the boat warranty to facilitate the repairs, in the end the warranty did not cover the necessary work. After the mechanical problems were repaired, the Bertones and Friedman conducted a closing on July 11, 2003.
At the closing, the Bertones signed a Final Purchase and Sales Agreement (“Final P&S”). Ex. 6. The Final P&S stated that the “ ‘Seller’ shall deliver the ‘Yacht’ ‘Free and Clear’ of any liens, mortgages, or applicable bills at the time of closing or, if there are outstanding liens, mortgages, or applicable bills. ‘Seller’agrees that ‘Brokers’ may deduct the applicable funds from the proceeds of the sale.” Ex. 6. The Bertones also signed a Bill of Sale that Friedman had prepared. Ex. 9. The Bertones then tendered a check for $39,695.00 made payable to Sea Dog. Ex. 7A. In addition, the Bertones gave Friedman two checks payable to the Commonwealth of Massachusetts for boat sales tax, title, and registration. Ex. 10. On July 12, 2003, the Bertones took possession of the boat.
During the course of the sea trial and the negotiations the Bertones also spoke with Darren Thurman (“Thurman”), a Sea Dog employee. Thurman did not receive title for the boat and did not advise the Bertones that they were required to receive title from Meskell. Thurman testified that, in his opinion, in Massachusetts all vessels must be newly titled and that the old title is irrelevant. He also testified that it is customary in the industry that title passes with the Bill of Sale. He further testified that the practice at Sea Dog was for the buyer to give Sea Dog representatives a check made out to the Commonwealth so that Sea Dog could obtain title for the buyer. Lastly, Thurman testified that it was not uncommon to conduct the closing in a bifurcated fashion.
On July 16, 2003, Meskell approved a Sellers Final Accounting. Ex. 17. The accounting lists the sale price, Friedman’s commission, costs, Bank payoff amount, and the amount due to Meskell. Ex. 17. On July 24, 2003, Meskell signed the Final P&S and Bill of Sale. On August 8, 2003, Meskell received his proceeds check for $7,084.69 from Friedman. Ex. 21, 24.
In late August of 2003, Friedman absconded with the remaining sale proceeds without satisfying the Bank’s lien. Several witnesses testified that Friedman has since been indicted for embezzlement in Essex County.
In September 2003, John Bertone began the process of documenting the boat with the United States Coast Guard. The Bertones filed an application with the Coast Guard and attempted to obtain a waiver of the requirement that they produce an original Bill of Sale. Ex. 14, 15A, 15B. In February of 2004, the Bertones enlisted New England Marine Documentation Service, located in Winchester, Massachusetts, to assist them with the federal documentation process. Ex. 18, 19, 27, 28. The Bertones obtained a Certificate of Documentation from the Coast Guard on March 15, 2004. Ex. 16.
*425 RULINGS OF LAW
1. Agency
An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf of or for the benefit of the principal, and subject to the principal’s control. Theos & Sons, Inc. v. Mack Trucks, Inc. 431 Mass. 736, 741 (2000). See Restatement (Second), Agency, §§14 and 15. This Court is persuaded by a preponderance of the evidence that Meskell and Friedman formed an agency relationship when they agreed that Friedman would attempt to obtain a buyer for Meskell’s boat. Meskell and Friedman agreed that Friedman would earn a ten percent commission on the boat sale if he successfully procured a buyer. In addition, Friedman represented Meskell during meetings with the Bertones. Friedman prepared the necessaiy documents and negotiated the purchase price, all subject to Meskell’s approval. Although Meskell and Friedman did not sign a written listing agreement, no such agreement is necessary to create an agency relationship. See Restatement (Second), Agency, §15. Therefore, an agency relationship existed between Meskell and Friedman because both parties agreed that Friedman would act on behalf of Meskell, subject to Meskell’s control.
Even where an agency relationship exists, however, the principal is liable to third parties for breach of a contract negotiated by his agent only if the agent was acting within the scope of his actual or apparent authority with respect to that particular transaction. Theos, 431 Mass, at 743. The parties dispute whether Friedman had authority to accept payment for the boat from the Bertones on Meskell’s behalf. This Court finds that the evidence is adequate to support a finding that Friedman had actual authority to accept payment on Meskell’s behalf. However, Meskell’s conduct during the course of the negotiations, as revealed in the trial testimony, establishes that even if Friedman did not have actual authority to accept payment, he nevertheless was cloaked with apparent authority to do so. “Apparent authority is ‘created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.’ ” Id. at 745, quoting Restatement (Second), Agency, §27. Apparent authority is also premised on estoppel principles. When a third party changes his position in reliance on this “reasonable belief, the principal is estopped from denying that the agency is authorized.” Linkage Corp. v. Tr. of Boston Univ., 425 Mass. 1, 16 (1997), quoting Hudson v. Massachusetts Prop. Ins. Underwriting Ass’n, 386 Mass. 450, 457 (1982). The relevant inquiry, then, is whether Meskell’s conduct with respect to the creation of Friedman’s agency supports a finding that the Bertones reasonably believed that Friedman had authority from the seller to accept payment from the Bertones at the closing.
After Meskell and Friedman formed an agency relationship, Meskell towed the boat from to Sea Dog’s yard in Salisbury, Massachusetts. Friedman then affixed a “For Sale” sign conspicuously displaying the Sea Dog logo to the boat. Ex. 26. Friedman negotiated the price of the boat with the Bertones, and Meskell later approved their offer. Friedman prepared the initial P&S signed by the Bertones on June 28, 2003. In addition, Friedman accepted the Bertones’ deposit check for $4,400.00 made payable to Sea Dog. Meskell did not object to Friedman’s drafting of the document or to his acceptance of the deposit payment. Meskell signed the initial P&S two days later on June 30, 2003,
Therefore, I conclude that in reliance upon Meskell’s conduct prior to the closing the Bertones reasonably believed that when they entered into the transaction with Friedman he was authorized to act on Meskell’s behalf. Indeed, Meskell’s acts cloaked Friedman and Sea Dog, from the viewpoint of a reasonable member of the public, with apparent authority to sell the boat and accept payment for it.
In addition, the principal may be bound by unauthorized acts of his agent if he “acquiesces in the agent’s action, or fails to promptly disavow after disclosure of material facts” relevant to the unauthorized act. Linkage Corp., 425 Mass, at 18. Although Meskell asserts that he believed he would attend the final closing, he nevertheless signed the Final P&S on July 24, 2003, thirteen days after the Bertones closed on July 11, 2003. The Final P&S clearly indicates that closing was to take place “on/or before 7/11 /03 at the office of Sea Dog Yacht Sales.” Ex. 6. Meskell further argues that he was not aware at the time he signed and returned the Final P&S and Bill of Sale that the Bertones had tendered $39,695.00 to Friedman. On August 20, 2003, however, Meskell accepted his proceeds check of $7,084.69 from Sea Dog. Ex. 21. Meskell cannot accept the benefits of a transaction purported to be done on his behalf and thereafter attempt to repudiate the allegedly unauthorized transaction. Id. at 19. In my opinion, Meskell’s acquiescence in Friedman’s conduct of the two closings, coupled with his acceptance of the benefits of the transaction, bars Meskell from now denying that Friedman was authorized to accept payment for the boat from the Bertones on his behalf.
2. Rightful Possession of the Boat
Article 9 guides the resolution of the competing ownership claims presented in these two cases. A sweeping revision of Article 9 became effective in Massachusetts on July 1, 2001, but many historical secured transactions principles remain relevant to the resolution of this dispute.[4]
A. The Bank’s Security Interest in the Boat
The Bank seeks replevin of the boat from the Bertones, claiming that under Article 9 it is the rightful possessor of the boat. By placing the boat for sale *426 without the Bank’s express written permission, Meskell breached the security agreement and the promissory note. Consequently, the Bank was entitled to immediate possession of the collateral, unless the Bertones took free of the Bank’s security interest in the boat.
The security agreement and note executed by Meskell and the Bank gave the Bank a security interest in the boat. G.L.c. 106, §1-201(37). A security interest is “effective according to its terms between the parties, against purchasers of the collateral and against creditors” unless the secured party is required to file a financing statement in order to perfect the interest. G.L.c. 106, §9-201(a).The secured party must file a financing statement to perfect the security interest in all cases except, among others, that of a purchase money security interest (“PMSI”). G.L.c. 106, §9-309(1). Therefore, the Bank was required to file a financing statement to perfect its interest in the boat unless the interest constituted a PMSI. Article 9 defines a PMSI as follows: “a security interest in goods is a [PMSI]... to the extent that the goods are purchase-money collateral with respect to that security interest.” G.L.c. 106, §9-103(b)(l). Purchase-money collateral are goods used to secure an “obligation of an obligor incurred as all or part of the purchase price of the collateral.” G.L.c. 106, §9-103(a)(l) and (2).
Meskell borrowed funds from the Bank to finance the sale of the boat and, in turn, granted the Bank a security interest in the boat to secure the purchase price. Therefore, the Bank’s security interest in the boat constituted a PMSI and the Bank was not required to file a financing statement to perfect its security interest in the collateral.
A PMSI is automatically perfected upon attachment. G.L.c. 106, §9-310(b) (2). The Bank’s security interest attached when the following events occurred: (1) Meskell signed the security agreement describing the boat as collateral, (2) the Bank gave Meskell value in the form of a loan, and (3) Meskell used the loan funds to obtain rights in the boat. G.L. 106, §9-203(a)-(b). The Bank’s interest is therefore enforceable according to its terms between the parties, any purchasers of the collateral, and any creditors, subject to the buyer of consumer goods exception set forth in G.L.c. 106, §9-320(b). G.L.c. 106, §9-201(a). The Bank’s interest in the boat takes priority over the Bertones’ interest, unless the Bertones demonstrate that they meet the requirements of the buyer of consumer goods exception as described below.
B. Buyer of Consumer Goods
The buyer of consumer goods exception in revised Article 9 mirrors the historical notion of buyer in ordinary course. G.L.c. 106, §9-307(2), as amended through St. 2001, c.26, §53. The aim of both provisions may be summarized as follows: “[o]ne who buys consumer goods from another consumer for his own personal use without knowledge of a perfected security interest takes the goods free of such interest unless the secured party has previously filed.” Nat’l Shawmut Bank of Boston v. Vera, 352 Mass. 11, 15 (1967), quoting Coogan, Article 9 of the Uniform Commercial Code: Priorities among Secured Creditors and the “Floating Lien,” 72 Harv.L.Rev. 838, 848. Under G.L.c. 106, §9-320(b), “a buyer of goods from a person who used or bought the goods for use primarily for personal, family, or household purposes takes free of a security interest, even if perfected, if the buyer buys: (1) without knowledge of the security interest; (2) for value; (3) primarily for the buyer’s personal, family, or household purposes; and (4) before the filing of a financing statement covering the goods.”
To invoke the protection of 9-320(b), both the buyer and seller of the goods must be consumers. New England Merch. Nat’l Bank v. Auto Owners Fin. Co., 355 Mass. 487, 488-89 (1969) (interpreting buyer in ordinary course provisions). To hold G.L.c. 106, §9-320(b) applicable, this Court must decide whether Meskell’s sale of the boat through his selling agents, Friedman and Sea Dog, constitutes a consumer-to-consumer sale. Agency principles guide this analysis. In a contractual context, any negotiation undertaken on behalf of the principal is deemed to be the act of the principal himself. Indeed, “whatever one does by another, he does so by himself so far as concerns legal responsibiliiy.” Fore River & C Corp. v. Commonwealth, 248 Mass. 137, 140 (1924). See also Kirschbaum v. Wennett 60 Mass.App.Ct. 807, 814-15 (2004) (delegated acts performed on behalf of trust deemed acts of trustee); Medeiros v. Middlesex Ins. Co., 48 Mass.App.Ct. 51, 57 (1999) (agent’s contractual act makes the principal the actual party to and obligor of the undertaking). In this case, title never passed from Meskell to Friedman or Sea Dog. The agency relationship was disclosed to the Bertones, and they were aware that they were purchasing the boat from the owner, a consumer. Although negotiated by Meskell’s agent, the Final P&S and Bill of Sale evidenced an agreement between the Bertones and Meskell for the sale of consumer goods. I am therefore persuaded by a preponderance of the evidence that the transaction in question falls within the buyer of consumer goods exception in G.L.c. 106, §9-320(b).
C. Knowledge, Good Faith, and Title
To defeat the Bank’s PMSI on the basis of the buyer of consumer goods exception, the Bertones must also meet additional criteria. The Bank and Meskell argue that the Bertones cannot claim the protection of §9-320(b) because (1) they had notice of Key Bank’s lien, and (2) they did not approach the transaction in good faith. The Bank and Meskell further argue that the Bertones are not the rightful possessors of the boat because they did not obtain title as required by the state statutory scheme.
The Bank’s lien is clearly marked on the state title. Ex. 1. The Bank and Meskell argue that the Bertones were on notice of the Bank’s lien because they did not receive the state Certificate of Title at closing. The *427 Article 9 provision regarding buyer of consumer goods, however, concerns knowledge, not notice. Whereas notice places a duty of inquiry on the party, “knowledge,” as defined in G.L.c. 106, §1-201(25), requires that the party have “actual knowledge” of the fact. Based on all of the facts previously developed about the transaction in question, and finding John Bertone’s trial testimony credible, I am persuaded by a preponderance of the evidence that the Bertones did not have actual knowledge of the Bank’s security interest in the boat.
Similar to their arguments on knowledge, the Bank and Meskell contend that the Bertones are not good-faith purchasers because they did not receive title when they tendered payment to Friedman at closing. The Bank and Meskell assert that by taking possession of the boat without title, the Bertones acted at their peril and were on notice that further inquiry into the state of title was necessary. Consequently, the Bank and Meskell argue, the Bertones’ failure to further inquire into the state of title at that time evidences the Bertones’ lack of good faith. The definition of good faith, however, does not place the buyer on a duty of inquiry. Dion v. Silver City Dodge, 398 Mass. 58, 60 (1986). Good faith means “honesty in fact in the conduct of the transaction concerned.” G.L.c. 106, §1-201(19).
The preponderance of the trial evidence demonstrates that on July 11, 2003, the Bertones had a genuine belief that they were purchasing the boat in a legitimate transaction free of liens. At all times during the transaction, the Bertones negotiated with Friedman, not Meskell. They had previously tendered a deposit to Friedman without incident. The Bill of Sale stated that all liens and encumbrances on the boat had been revealed. Ex. 9. Moreover, both the initial P&S and the Final P&S conspicuously and unambiguously stated that the boat would be sold free of liens, or that any outstanding liens would be satisfied by the sale proceeds. Ex. 4, 6. Lastly, Sea Dog’s employee, Thurman, represented to John Bertone that the Bill of Sale was the most important aspect of the transaction, and that title and registration were ancillary to the sale. The Bertones obtained a Bill of Sale that they used to document the boat through the Coast Guard pursuant to the federal vessel documentation regime. 46 C.F.R. 67.1 etseq.
Under G.L.c. 90B, §2(6), a boat owner may choose to register the vessel within the state system or to document the vessel with the United States Coast Guard. The Bertones reasonably pursued federal documentation because, as John Bertone testified, he believed the federal approach afforded greater protection of their property. All of this evidence supports my conclusion that the Bertones acted honestly and in good faith with respect to the closing on July 11,2004.
The Bank and Meskell also argue that the state boat title statute nullifies transactions involving titled motorboats where, as here, the owner does not deliver title to the transferee. G.L.c. 90B, §36(c). Indeed, the boat title statute not only requires buyers of registered vessels to obtain a certificate of title, but also requires sellers of such vessels to provide a certificate of title upon transfer or sale. G.L.c. 90B, §36(c). Here, a sale occurred even though Meskell did not furnish the Bertones with the state title. Article 2 of the Code notes the Code’s “departure from the title or property concept for deciding sales controversies.” G.L.c. 106, §2-401 general cmt. The Code provisions with respect to passing of title note that “title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods,.. . even though a document of title is to be delivered at a different time or place,” unless the parties contract otherwise. G.L.c. 106, §2-401(2). See also G.L.c. 106, §2-101 cmt. The Bertones tendered the full contract price and took possession of the boat, thereby completing delivery.
The boat title statute does not displace or supersede G.L.c. 106, §9-320(b), but imposes additional requirements upon boat owners and dealers regarding the title and registration of vessels. The statute does not vitiate the transfer of ownership that occurred when the Bertones, without knowledge and in good faith, furnished consideration for the boat according to the parties’ agreement. See Dion, 398 Mass, at 61.
Because the Bertones purchased the boat for value from another consumer, intended to use the boat for household purposes, and did not have knowledge of the Bank’s security interest, their ownership rights are superior to those of the Bank. Article 9 imposes the burden on the party most able to insulate itself from risk. Here, the Bank had the option of filing a financing statement to ensure its priority in this factual situation, even though it was not required to file to perfect its PMSI. G.L.c. 106, §9-320(b)(4). The Bank chose not to avail itself of the additional protection afforded by filing a financing statement. In addition, Meskell enlisted Friedman as his agent to represent him in the boat sale and accepted the benefits of that transaction. Therefore, Meskell bears the loss resulting from Friedman’s apparent malfeasance.
3. The Bank’s Claims Against Meskell
The Bank asserts that Meskell breached the note, thereby entitling it to recover from Meskell the full principal amount. The maker of a promissory note agrees to pay the note according to its terms. G.L.c. 106, §3-412. Moreover, “(i]t is . . . elementary that an unambiguous agreement must be enforced according to its terms.” Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). The terms of the note are unambiguous with regard to the definition and consequences of default. The note states that the borrower will be in default if he breaches any “significant term or condition of [the] agreement.” Ex. 3. The note sets forth various conditions governing the sale or transfer of the collateral. First, the note requires the borrower *428 to acquire Bank’s written permission before giving control or possession of the collateral to anyone. Second, the note states that until the loan is paid in full, the borrower may not “transfer any interest in the Collateral by sale, lease, charter or giving the collateral to anyone else” without the Bank’s permission. By placing the boat for sale with Friedman, Meskell breached a significant term of the note and, consequently, defaulted on the note. The terms of the note state that in the event of a default, the borrower must immediately pay the entire unpaid balance of the loan and return the collateral to Bank. Thus, according to the unambiguous terms of the agreement, Meskell must pay the Bank the full principal amount due.
Unless the parties settle or choose to preserve this issue pending appeal, the Bank shall submit a motion to the Court proposing the amount due from Meskell on the note. Upon receipt of any objection from Meskell to the Bank’s proposed amount, the Court will hold a hearing to determine the proper measure of principal and interest due.
4. Meskell’s Conversion Claim Against the Bertones
Meskell’s claim against the Bertones sounds in conversion. In order to succeed on his conversion claim, Meskell must demonstrate that at the time of the alleged conversion he had a right to immediately possess the boat. Massachusetts Lubricant Corp. v. Socony-Vacuum Oil Co., Inc., 305 Mass. 269, 271 (1940). By placing the boat for sale with Friedman without the express written permission of the Bank, Meskell breached the terms of his security agreement and the note, placing him in default. According to the note’s terms, default entitles the Bank to immediate possession of the collateral. As discussed above, however, the Bank’s right to immediate possession upon Meskell’s default is limited by the narrow buyer of consumer goods exception set forth in G.L.c. 106, §9-320(b). Once Meskell placed the boat for sale, he was in default on the note, and no longer entitled to possession of the boat. Therefore, Meskell’s claim for conversion against the Bertones fails.
5. Remaining Claims
As detailed above in Part II, the Bertones are the rightful possessors of the boat under Article 9. By failing to deliver the state title to the Bertones, Meskell breached the parties’ agreement. Meskell must specifically perform the Final P&S and deliver to the Bertones the Certificate of Title issued by the Commonwealth.
The Bertones’ request for damages pursuant to G.L.c. 231, §6F, is denied because I do not find that Meskell’s claims against the Bertones were insubstantial or frivolous, or advanced in bad faith. Similarly, the Bertones’ claim against Meskell for malicious prosecution is dismissed because the evidence did not establish that Meskell brought these claims in the context of anything other than a good-faith legal dispute.
The Bank is not entitled to an injunction barring the Bertones from preventing the boat’s repossession because, as detailed above in Part II, the Bertones are the rightful possessors of the boat.
There was insufficient evidence presented during the trial to support the Bertones’ claim that the Bank’s single phone call requesting information about the boat amounted to a violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1629(f), or the Massachusetts Collection Practices Act, G.L.c. 93, §49. Nor was there sufficient evidence to support the Bertones’ allegation that the Bank violated the Massachusetts Consumer Protection Act, G.L.c. 93A.
ORDER
For the foregoing reasons, with respect to Suffolk No. 04-0295, it is hereby ORDERED that Meskell’s request for a permanent injunction against the Bertones is DENIED. It is also ORDERED that judgment enter for the Bertones on Count I of their counterclaim, declaring that Meskell specifically perform the Final Purchase and Sales Agreement by delivering the Massachusetts Certificate of Title to the Bertones. It is further ORDERED that a judgment enter for Meskell on the Bertones’ counterclaims in which they seek relief for malicious prosecution and for frivolous or bad faith claims pursuant to G.L.c. 231, §6F.
With respect to SuffolkNo. 04-1481, it is ORDERED that a judgment enter for the Bank against Meskell on Count I of the Bank’s amended complaint. The Bank’s relief shall be determined upon receipt of its written motion setting forth its proposed damage award amount. On Count II, it is ORDERED that a judgment enter for the Bertones on the Bank’s claim for equitable relief. Regarding the Bertones’ counterclaims, it is ORDERED that a judgment enter for the Bank on all of their counterclaims for relief pursuant to the Federal Fair Debt Collection Practices Act, the Massachusetts Collection Practices Act, and the Massachusetts Consumer Protection Act.

On April 15, 2004, the Bertones requested that a default judgment enter against Meskell pursuant to Mass.R.Civ.P. 55(a) for failure to respond to their counterclaim. On April 29, 2004, a default judgment entered against Meskell. This Court, in its discretion pursuant to Mass.R.Civ.P. 60(b)(6), vacated the Default Judgment and allowed plaintiff/defendant in the counterclaim Meskell to file his answer late on September 9, 2004.

Briefs submitted by the parties cite to case law analyzing G.L.c. 106, §9-307(2). This provision has been amended and its current version is G.L.c. 106, §9-320(b). Revised Article 9 may be found in its entirety in the 2004 Cumulative Annual Pocket Part to Volume 15 of the Massachusetts General Laws Annotated. To date, there is no appellate case law construing the contours of the revised provision. Revised Article 9 governs this transaction because Meskell and the Bank executed their security agreement in September of 2001, almost three months after revised Article '9 became effective.

Linda Bertone and John Meskell.